UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARY FRANCES HEISEL, as Trustee of the Robert A. Heisel Revocable Trust, dated April 15, 2000, and as Personal Representative of the Estate of Robert Heisel, doing business as Heisel Equipment Company, MARY FRANCES HEISEL, individually, a Missouri resident, LARRY HEISEL, a Missouri resident, MARK HEISEL, a Missouri resident, and JANE NEIER, a Missouri resident, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN DEERE CONSTRUCTION & FORESTRY COMPANY, Successor in Interest to JOHN DEERE INDUSTRIAL EQUIPMENT CO., a Delaware corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) No. 4:07 CV 1712 DDN |

### MEMORANDUM AND ORDER

This action is before the court on the motion of defendant John Deere Construction & Forestry Company (John Deere) to dismiss the dealership termination claims and all plaintiffs other than the Estate of Robert Heisel. (Doc. 14.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### I. BACKGROUND

The plaintiffs commenced this action against John Deere in an effort to prevent the company from terminating the Heisel Equipment Company's John Deere dealership (Heisel dealership) and to recover damages for being denied an opportunity to market the Model 605C crawler loader. The plaintiffs are Mary Frances Heisel, the wife of the late Robert Heisel,

acting in an individual capacity, and acting in an official capacity as trustee of the Robert A. Heisel Revocable Trust, and as the personal representative of the Estate of Robert Heisel; and Larry Heisel, Mark Heisel, and Jane Heisel, the surviving children of the late Robert Heisel. (Doc. 1 at ¶ 1.) The plaintiffs have invoked the diversity of citizenship subject matter jurisdiction of the court granted by 28 U.S.C. § 1332.

Beginning in 1954, Robert Heisel operated a John Deere Dealership in Labadie, Missouri, as the Heisel Equipment Company, a sole proprietorship. In establishing the John Deere dealership, Robert Heisel executed two agreements with John Deere. The first agreement covered utility equipment and the second agreement covered forestry equipment. (Id. at ¶¶ 7, 8, 10; Doc. 1, Ex. 1 at 2-3, 11-12.) Each agreement contains the same relevant contractual language and each contract was signed by John Deere and Robert Heisel, as the owner of the sole proprietorship. (See Doc. 1, Ex. 1 at 2-6, 11-15.)

The "John Deere Industrial Dealer Agreement" (Dealership Agreement) states, in relevant part,

> The Dealer whose signature appears on the next page hereby applies to the John Deere Industrial Equipment Company (the "Company") for appointment as an Authorized Industrial Dealer for the [Utility / Forestry] Equipment Line and agrees that the relationship between him and the Company will be governed by the Terms of Appointment on the succeeding pages of this booklet. When it executes this Agreement, the Company accepts the Dealer's application and also agrees to be bound by the Terms of Appointment.
>
> . . .
>
> 1. OBLIGATIONS OF THE PARTIES
> During the period of the Dealer's appointment as a John Deere Authorized Industrial Dealer, the parties accept the following obligations and duties:
>
> (a) The Company agrees to accept orders placed by the Dealer for Goods which the Company contemplates will be shipped during the period of appointment, subject to the Company's Conditions of Sale. However, the Company shall have no liability to the Dealer for delay, failure or refusal to ship as provided in the Conditions of Sale or Section 4 hereof.

-2-

. . .

2. IMMEDIATE TERMINATION FOR CAUSE

While it is the hope and expectation of the parties that this Agreement will create a mutually profitable and satisfactory relationship, the success of an equipment dealership depends to a substantial degree on the ability, energy and integrity of the individual or group of associates who operate it. Adequate financial resources are also essential. The Company, may, therefore, immediately terminate the Dealer's appointment by giving notice to the Dealer at any time after the happening of any of the following:

(a) Death of an individual proprietor, partner, major shareholder, or the manager of the dealership;

(b) Withdrawal of an individual proprietor, partner, major shareholder, or the manager of the dealership or a substantial reduction in interest of a partner or major shareholder, without the prior written consent of the Company;

. . .

4. EFFECT OF TERMINATION OF APPOINTMENT

Termination of the Dealer's appointment hereunder means that the obligations and duties of the parties under Section 1 no longer apply, and that the Company may decline to fill accepted orders placed before such termination.

. . .

5. DEATH OF DEALER

If the Dealer's appointment is terminated because of the death of one of the persons enumerated in Section 2(a) at a time when no other action has been taken under Section 2 or 3 to terminate the Dealer's appointment, it is agreed that:

Cooperation with Survivors

(a) In order to facilitate orderly settlement of the estate of the deceased and allow the heirs and/or surviving associates (partners or shareholders) of the deceased to rearrange their affairs and determine whether they wish to liquidate or to continue to operate the dealership, the Company will, for a period of at least 180 days after such death, be willing to make shipments of orders previously received and accept new orders from the Dealer Corporation or Dealer's estate and/or surviving partners, as the case may be. The Company's obligations under this Section 5 to accept orders and make shipment shall be subject to the provisions of Section 1(a) and the Company's Conditions of Sale then in affect. Such obligations are also subject to the Company's being satisfied that the person executing any new order is

-3-

legally authorized to do so, and that, with regard to the new order or the shipment, the Dealer corporation or Dealer's estate and/or surviving partners are legally bound by these Terms of Appointment, the Conditions of Sale, Chattel Mortgage or the Security Agreement executed by the Dealer and any filed Financing Statements executed in connection therewith.

(b) If the heirs and or surviving associates wish to continue operating the dealership, the Company will cooperate with them in their effort to arrange to do so, and will offer to execute a new Dealer Agreement with the Dealer corporation or the heirs (or the Dealer's estate, if appropriate due to the anticipated length of administration) and/or the surviving partners if it believes them to be capable of carrying out the obligations thereunder. The Company will inform the heirs and/or surviving associates in writing, as promptly as possible, as to whether or not the Company elects to offer a new Agreement to them and, if the Company so elects, the major conditions, including credit or financial conditions, if any, under which it would deem them capable of carrying out such obligations.

(c) The Company shall have discharged its obligations under Subsections (a) and (b) and may discontinue shipments to the Dealer corporation, Dealer's estate, or surviving partners, as the case may be, under any of the following conditions:

(I) The Company informs the Dealer corporation or the heirs and/or the surviving partners of the deceased in writing (by notification sent to the Dealer corporation, the Dealer's estate, the heirs, or one of the surviving partners, as is appropriate in the circumstances) that it will not execute a new Dealer Agreement and 180 days shall have elapsed since such death.

(Doc. 1, Ex. 1 at 2, 5-6, 11, 14-15.)

In October 2006, Robert Heisel died, leaving a wife and children. (Doc. 1 at ¶¶ 1, 37.) Shortly after his death, John Deere wrote to Mary Frances Heisel, and stated the company would be terminating the Heisel dealership after 180 days, according to the terms of the John Deere Dealership Agreement. (Id. at ¶¶ 37, 38.) The 180-day period was intended to afford the Heisel dealership time in which to wind down its affairs. (Doc. 1, Ex. 3.) Mary Frances Heisel wrote back to Deere, expressing her desire to continue operating a John Deere dealership in Labadie. (Doc. 1, Ex. 4.) In an attempt to resolve the dispute, John Deere and the plaintiffs negotiated an extension of the dealership until October 19, 2007. (Doc. 1 at ¶ 41.)

-4-

In anticipation of that deadline, the plaintiffs filed suit on October 9, 2007, in an effort to prevent John Deere from terminating the Heisel dealership and to recover damages for being denied an opportunity to market the Model 605C crawler loader. (See Doc. 1.) The complaint alleges John Deere's reasons for terminating the dealership are pretextual and legally unsustainable. (Doc. 1 at ¶ 2.) In particular, the complaint alleges John Deere "simply wants to eliminate smaller dealers - which is not good cause." (Id. at ¶ 3.) In support of this allegation, the complaint states John Deere has taken incremental steps to weaken the smaller, family-owned dealerships, by withholding products from them, and shifting these products to larger dealers. (Id. at ¶ 19.) The complaint alleges John Deere stated it hopes to consolidate its dealer network into dealers with gross sales of at least $50 million a year. (Id.)

The complaint also alleges the plaintiffs could continue to adequately fund and maintain the Heisel dealership. (See id. at ¶¶ 2, 11-15, 43.) The complaint states the plaintiffs have all worked in the Heisel dealership and continue to "manage and grow the business in complete accord with all standards established by [John Deere]." (Id. at ¶ 2.) According to the complaint, the plaintiffs' financial condition is more than adequate to satisfy any of John Deere's concerns regarding the family's ability to continue as a dealer. (Id. at ¶ 15.) In particular, the complaint alleges the Heisel dealership has great market share numbers, its annual revenue places it among the top single store John Deere dealerships, and is capable of securing lines of credit. (Id. at ¶¶ 15, 18.)

In Counts I, II, III, and VI, the plaintiffs seek preliminary and permanent injunctive relief against the termination of the Heisel dealership. In Count I, the plaintiffs allege a violation of the Missouri Farm Implement Dealership Act, Mo. Rev. Stat. § 407.838, et seq. In Count II, the plaintiffs allege a violation of the Missouri Industrial Maintenance and Construction Power Equipment Act, Mo. Rev. Stat. § 407.750, et seq. In Count III, the plaintiffs allege breach of contract. In Count VI, the plaintiffs allege a violation of the covenant of good faith and fair dealing. (Doc. 1 at ¶¶ 44-58, 69-72.)

In Counts IV, V, and VI, the plaintiffs seek damages from being denied an opportunity to market the Model 605C crawler loader. In Count IV, the plaintiffs allege a violation of the Missouri Farm Implement Dealership Act. In Count V, the plaintiffs allege breach of contract. In Count VI, the plaintiffs allege a violation of the covenant of good faith and fair dealing. (Doc. 1 at ¶¶ 59-72.)

The complaint does not allege John Deere has failed to provide sufficient notice, under the statutes, the Dealership Agreement, or the common law, of the company's intention to end the Heisel dealership. (See Doc. 1.)

On October 12, 2007, the plaintiffs filed a motion for a temporary restraining order (TRO). (Doc. 4.) On October 17, 2007, John Deere responded to the motion for the TRO, and filed this motion to dismiss. (Docs. 13, 14.) The court held a hearing on the motion for a TRO on October 18, 2007, and granted the motion for the TRO the following day.[1] (Doc. 17.) The court's order extended the parties' existing relationship until the court ruled the motion to dismiss. (See Docs. 17, 25.)

The court has original jurisdiction based on the diversity of the parties' citizenship and because the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

## II. DISCUSSION

John Deere has moved to dismiss the complaint for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the complaint. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993); Holden Farms, Inc. v. Hog Slat, Inc., 347 F.3d 1055, 1059 (8th Cir. 2003). The Supreme Court recently issued a new standard for evaluating motions to dismiss. Bell

---

[1] The plaintiffs and defendant participated in the hearing on the motion for a temporary restraining order in an adversarial setting. Although denominated a TRO, the order was granted for an indeterminate length, and therefore, should be viewed as a preliminary injunction. See Kan. Hosp. Assoc. v. Whiteman, 835 F. Supp. 1548, 1551 (D. Kan. 1993); Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2951 (2007).

Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007) (overruling the "no set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Despite overruling the Conley standard, the Supreme Court cautioned that it had not created a heightened pleading standard. Bell Atlantic, 127 S. Ct. at 1973 n.14, 1974.

Under Bell Atlantic, a complaint must include enough facts to state a claim for relief that is plausible on its face. Bell Atlantic, 127 S. Ct. at 1974. If the claims are merely conceivable - but not plausible - the court must dismiss the complaint. Id. To meet the plausibility standard, the complaint must contain "more than labels and conclusions." Id. at 1965. A complaint does not, however, need specific facts; a complaint only needs to "give the defendant fair notice of what the claim is and the grounds upon which it rests." Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007). The Federal Rules of Civil Procedure demand only that a complaint present a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). That said, the allegations must still be enough to "raise a right to relief above the speculative level." Bell Atlantic, 127 S. Ct. at 1965.

A complaint must be liberally construed in the light most favorable to the plaintiff. See Bell Atlantic, 127 S. Ct. at 1964-65. Moreover, a court must accept the facts alleged as true, even if doubtful. Id. at 1965. Thus, a well-pled complaint may proceed even if it appears the recovery is very remote or unlikely. Id. To warrant dismissal, the plaintiff's entitlement to relief must fall short of being plausible. Id. at 1973 n.14, 1974.

### A. Claims Seeking Injunctive Relief

Counts I, II, III, and VI seek injunctive relief against the termination of the Heisel dealership. In its motion to dismiss, John Deere argues that neither the Missouri Farm Implement Dealership Act (Farm Equipment Act) nor the Missouri Industrial Maintenance and Construction Power Equipment Act (Construction Equipment Act) provides the plaintiffs with grounds for blocking termination of the dealership. In effect, John Deere argues the plaintiffs are seeking a perpetual dealership. John Deere also argues that the plain language of the

-7-

Dealership Agreement does not compel the company to offer the plaintiffs a new dealership after the death of the proprietor; the term "will" does not mean "shall." (Docs. 15, 27.)

In response, the plaintiffs argue that the Farm Equipment Act and the Construction Equipment Act do not provide grounds for terminating the Heisel dealership. They argue death is not included within the term "withdrawal." The plaintiffs also argue the plain language of the Dealership Agreement is mandatory, providing that John Deere "will" offer a new agreement. Finally, the plaintiffs argue that the implied covenant of good faith and fair dealing favors granting injunctive relief. (Doc. 21.)

**Violation of the Missouri Farm Equipment Act**

Count I alleges a violation of the Missouri Farm Equipment Act. Under the Farm Equipment Act,

> No farm equipment manufacturer . . . may terminate, cancel or fail to renew a dealership agreement or substantially change the competitive circumstances of a farm equipment dealership without good cause. **Good cause** means failure by a farm equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement if such requirements are not different from those requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement. In addition, good cause shall exist whenever:
>
> (1) The farm equipment dealer has transferred an interest in the farm equipment dealership without the manufacturer's written consent, or there has been a withdrawal from the dealership of an individual proprietor, partner, major shareholder, or the manager of the dealership, or there has been a substantial reduction in interest of a partner or major stockholder without the written consent of the manufacturer . . . .

Mo. Rev. Stat. § 407.840.[2]

Under the plain language of the statute, good cause for termination exists when "there has been a withdrawal from the dealership of an

---

[2]Unless otherwise stated, citations to the relevant Missouri statutes are to the 2000 edition of the Revised Statutes of Missouri.

-8-

individual proprietor . . . ." Mo. Rev. Stat. § 407.840(1). Withdrawal may be by death. See John Deere Constr. Equip. Co. v. Wright Equip. Co., 118 F. Supp. 2d 689, 693 (W.D. Va. 2000). In Wright Equipment, the court was interpreting a Maryland statute with nearly identical language as the Farm Equipment Act. Id. Under the Maryland Dealer Contract Act, a supplier may not terminate, cancel, fail to renew, or substantially change a dealer's contract without good cause. Md. Code Ann. § 19-103. Good cause for terminating a dealer contract exists where there has been the "withdrawal of an individual proprietor . . . of the dealership . . . without the prior written consent of the supplier." Md. Code Ann. § 19-102(7); Wright Equip., 118 F. Supp. 2d at 693.

The plaintiffs argue "withdrawal" does not include death. This interpretation would create an illogical result. Under this interpretation, good cause for terminating a dealership would exist where a proprietor has withdrawn or left the business because of an illness, old age, or retirement, but not where a proprietor has left the business by dying. Looking to Wright Equipment and the plain language of the Missouri Farm Equipment Act, the undersigned concludes "withdrawal" naturally includes withdrawal by death. See Missouri v. Kinder, 122 S.W.3d 624, 631 (Mo. Ct. App. 2003) (When interpreting a statute, courts are to presume a logical result, and not an unreasonable one).

Interpretations of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801, et seq., bolster this interpretation of the Farm Equipment Act. The PMPA seeks to protect franchisees from arbitrary and discrminatory termination of a franchise. Kostantas v. Exxon Co., U.S.A., 663 F.2d 605, 606 (5th Cir. 1981). The PMPA recognizes the disparity in bargaining power between the franchisee and the franchisor and works to prevent abusive trade practices by the latter. Id. But despite this relatively broad mandate, nothing in the act prevents a franchisor from terminating the franchise upon the death of the franchisee. Id.; Iannuzzi v. Exxon Co., U.S.A, 572 F. Supp. 716, 721-22 (D.N.J. 1983); Blankenship v. Knox Oil Co., 548 F. Supp. 789, 790-91 (E.D. Tenn. 1982); Lanham v. Amoco Oil, Co., 481 F. Supp. 405, 407 (D. Md. 1979). Like the Farm Equipment Act, the PMPA does not specifically mention death as good cause for termination. 15 U.S.C. § 2802(b)(2).

Instead, the PMPA authorizes termination where an event occurs which is relevant to the franchise relationship and which makes termination of the franchise reasonable. 15 U.S.C. § 2802(b)(2)(C); Ayers v. Marathon Ashland Petroleum LLC, No. 1:03-cv-1780-RLY-TAB, 2007 WL 3171445, at *2 (S.D. Ind. Oct. 26, 2007).

Under the Farm Equipment Act, the farm equipment manufacturer must provide the dealer with at least ninety days written notice before terminating the dealership. Mo. Rev. Stat. § 407.842. According to the complaint, John Deere has complied with the notice requirements of the statute. (Doc. 1 at ¶ 37.)

Because Robert Heisel's death constitutes "a withdrawal from the dealership of an individual proprietor," good cause exists for terminating the dealership. In addition, John Deere has complied with the statute's notice requirements. The complaint fails to state a claim for a violation of the Missouri Farm Equipment Act. The motion to dismiss is granted as to Count I.

### Violation of the Missouri Construction Equipment Act

Count II alleges a violation of the Missouri Construction Equipment Act. Under the Construction Equipment Act,

> Any manufacturer, wholesaler or distributor of industrial, maintenance and construction power equipment . . . who enters into a written or parol contract with any person, firm, or corporation engaged in the business of selling and repairing industrial, maintenance and construction power equipment . . . shall not terminate, cancel, or fail to renew any such contract without good cause. **"Good cause"** means failure by the retailer to substantially comply with essential and reasonable requirements imposed upon the retailer by the contract if such requirements are not different from those requirements imposed on other similarly situated retailers either by their terms or in the manner of their enforcement. In addition, good cause shall exist whenever:
>
> (1) The retailer has transferred an interest in the retailer business without the manufacturer's, wholesaler's or distributor's written consent, or there has been a withdrawal from the retailer's business of an individual proprietor, partner, major shareholder, or the manager of the retailer's business, or there has been a substantial reduction in interest of a partner or major stockholder without the written consent of the manufacturer, wholesaler, or distributor.

-10-

Mo. Rev. Stat. § 407.753.1.

Under the plain language of the statute, good cause for termination exists when "there has been a withdrawal from the retailer's business of an individual proprietor . . . ." Mo. Rev. Stat. § 407.753.1(1). For the reasons stated above, "withdrawal" may be by death.

Like the Farm Equipment Act, the Construction Equipment Act provides for ninety days written notice before termination of the dealership. Mo. Rev. Stat. § 407.753.2. According to the complaint, John Deere has complied with the notice requirements of the statute. (Doc. 1 at ¶ 37.)

Because Robert Heisel's death constitutes "a withdrawal from the retailer's business of an individual proprietor," good cause exists for terminating the dealership. In addition, John Deere has complied with the statute's notice requirements. The complaint fails to state a claim for a violation of the Missouri Construction Equipment Act. The motion to dismiss is granted as to Count II.

**Breach of Contract**

Count III alleges John Deere breached the Dealership Agreement. According to the plaintiffs, John Deere "is obligated to offer to the heirs a new Dealer Agreement . . . ." (Doc. 1 at ¶ 57.) In support of this claim, the plaintiffs point to the language "will cooperate" and "will offer to execute a new Dealer Agreement" contained in Section 5(b) of the Dealership Agreement.

A federal court sitting in diversity applies the substantive law of the state in which it sits. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Under Missouri law, a court must not alter or construct a new contract through interpretation. Pepsi MidAmerica v. Harris, 232 S.W.3d 648, 654-55 (Mo. Ct. App. 2007). A court's duty is limited to the interpretation of the contract. Id. at 655. In interpreting a contract, the court's central obligation is to "ascertain the intention of the parties and to give effect to that intent." Id. To determine the intent of the parties, the terms of a contract are read as a whole, and given their plain, ordinary, and usual meaning. Id. Unless the contract is

ambiguous, the intent of parties is determined based on the contract alone, and not on extrinsic evidence. Armstrong Bus. Servs., Inc. v. H & R Block, 96 S.W.3d 867, 874 (Mo. Ct. App. 2002). A contract is ambiguous if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain. Id. A contractual provision is not ambiguous just because the parties disagree over its meaning. Id.

The Dealership Agreement, read as a whole, does not compel John Deere to offer the plaintiffs a new dealership or extend the life of the current dealership. In Section 2, under the heading "IMMEDIATE TERMINATION FOR CAUSE," the Dealership Agreement provides that John Deere may "<u>immediately terminate</u> the Dealer's appointment by giving notice to the Dealer <u>at any time</u> after the . . . (a) Death of an individual proprietor . . . ." (Doc. 1, Ex. 1 at 5, 14) (emphasis added). By its plain language, the Dealership Agreement accounts for the possibility of a proprietor's death. In fact, Section 5 of the Dealership Agreement is entirely devoted to this contingency, entitled "DEATH OF DEALER." (Id. at 5, 14.)

Section 5 contains three subsections, under the heading "Cooperation with Survivors." In subsection (b), the contract states that, if the heirs wish to continue operating the dealership, "the Company will cooperate with them in their effort to arrange to do so, and will offer to execute a new Dealer Agreement" with the Dealer corporation, the heirs, or the Dealer's estate. The subsection continues, stating John Deere "will inform the heirs . . . in writing, as promptly as possible, as to whether or not the Company elects to offer a new Agreement to them and, if the Company so elects," under what conditions. (Doc. 1, Ex. 1 at 6, 15.)

In the following subsection, the Dealership Agreement states, "[t]he Company <u>shall</u> have discharged its obligations under Subsections (a) and (b) and may discontinue shipments to the Dealer corporation, Dealer's estate, or surviving partners" where John Deere informs the Dealer Corporation, the heirs, or the Dealer's estate, in writing, "that it will not execute a new Dealer Agreement and 180 days shall have elapsed since such death." (Doc. 1, Ex. 1 at 6, 15.)

-12-

Reading the contract as a whole, Section 2 governs the termination of the dealership, while Section 5 governs the winding down of the dealership and the possibility of a new dealership agreement. Under Section 2 of the Dealership Agreement, John Deere has the authority to "immediately terminate" Robert Heisel's appointment after his death - provided the company gives the proper notice. According to Section 4, terminating the Dealer's appointment means "the obligations and duties of the parties under Section 1 no longer apply . . . ." Looking to the plain language of Section 2, the undersigned concludes John Deere will not breach the Dealership Agreement by terminating the Heisel dealership.

Looking to Section 5, and reading subsections (b) and (c) together, the undersigned also concludes the Dealership Agreement does not compel John Deere to offer the plaintiffs a new dealership. In subsection (b), the contract speaks of what John Deere "will" do. In subsection (c), the contract specifies under what conditions John Deere "shall have discharged" its obligations under subsection (b). Given the structure of the subsections, with subsection (c) following subsection (b), and explicitly stating the conditions for satisfying subsection (b), Section 5 does not compel John Deere to offer the plaintiffs a new dealership.

The varying uses of "will" and "shall" support this interpretation. In subsection (b), the Dealership Agreement uses "will." In subsection (c), the Dealership Agreement uses "shall." According to the Oxford English Dictionary, the word "will," is an "auxiliary of the future tense with implication of intention or volition (thus distinguished from shall . . . .)." Oxford English Dictionary 134 (2d ed. 1971). In the 2nd and 3rd person "will" is an "auxiliary expressing mere futurity," forming the future tense with a present infinitive, and forming the future perfect tense with a perfect infinitive. Id. Only in the first person, can the word "will" correspond to shall. Id. A note from the definition of "shall" elaborates on this point. Id. at 609-10. "[S]ince the middle of the 17th [century] the general rule (subject to various exceptions) has been that mere futurity is expressed in the first person by shall, [and] in the second and third [person] by will." Id. Since the Dealership Agreement is written in the third person, the use of the word "will" in subsection (b) expresses mere futurity, and does not

-13-

compel John Deere to offer the plaintiffs a new Dealership Agreement. See id. at 134, 609-10.

In addition, the "will cooperate" and "will offer" language in subsection (b) is followed by the conditional clause "if [John Deere] believes [the heirs or surviving associates] to be capable of carrying out the obligations thereunder." (Doc. 1, Ex. 1 at 6, 15.); see Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d 1063, 1066 (8th Cir. 1996) (phrases such as "if" traditionally indicate conditions not promises). A promise is an assurance from one party to another that performance will be rendered. Id. A condition, unlike a promise, "creates no rights or duties in and of itself, but only limits or modifies rights or duties." Id. The use of a conditional clause following the "will cooperate" and "will offer" language also indicates the Dealership Agreement does not compel John Deere to offer the plaintiffs a new dealership. See id.

A contrary holding would effectively create a perpetual dealership. And under Missouri law, a court should be reluctant to find that a "contract confers a perpetuity of right or imposes a perpetuity of obligation." Armstrong Bus. Servs., 96 S.W.3d at 875. Any intent to create a perpetual contract must be unequivocally expressed. Id. A contract will not be construed to confer a perpetual right or obligation unless the contract language compels that construction. Id.; see also Iannuzzi, 572 F. Supp. at 721 ("[A] franchise agreement is a contract of a personal nature and in the absence of a provision that it survives the death of the franchisee, it terminates upon the death of the franchisee."). Simply put, franchises and dealerships are not estates of inheritance. See Iannuzzi, 572 F. Supp. at 722. Section 5 does not compel John Deere to offer the plaintiffs a new Dealership Agreement.

The complaint fails to state a claim for breach of the Dealership Agreement. The motion to dismiss is granted as to Count III.

### Violation of the Covenant and Good Faith and Fair Dealing

Count VI alleges John Deere breached the covenant of good faith and fair dealing. In particular, the plaintiffs claim John Deere failed to

-14-

"conduct itself so that Heisel would receive the full benefits and fruits" of the Dealership Agreement. (Doc. 1 at ¶ 70.)

In every contract there is an implied covenant of good faith and fair dealing. Finova Capital Corp. v. Ream, 230 S.W.3d 35, 45 (Mo. Ct. App. 2007). The covenant prevents a party to the contract from acting in a manner that contradicts the spirit of the transaction or denies the other party an expected benefit of the contract. Id. That said, the implied covenant of good faith and fair dealing cannot create new obligations that are not already contained within the contract's express terms. Comprehensive Care, 98 F.3d at 1066 (applying Missouri law); see also Conservative Fed. Sav. and Loan Ass'n v. Warnecke, 324 S.W.2d 471, 479 (Mo. Ct. App. 1959) (There can be no implied covenant where the subject is completely covered by the contract). More to the point, "many courts have held that the implied covenant may not be applied to limit a clear contractual provision allowing termination of the contract without cause." Taylor Equip., Inc. v. John Deere Co., 98 F.3d 1028, 1032 (8th Cir. 1996) (applying South Dakota law); see also Hubbard Chevrolet Co. v. Gen. Motors Corp., 873 F.2d 873, 878 (5th Cir. 1989) (The implied good faith covenant cannot override or contradict the express contractual language in a dealership agreement).

The plain and express language of the Dealership Agreement allows John Deere to terminate a dealership, without more, upon the death of an individual proprietor. Under Comprehensive Care, Taylor Equipment, and Hubbard Chevrolet, the plaintiffs may not rely on the implied covenant of good faith and fair dealing to override or contradict this contractual right. The complaint therefore fails to state a claim for a violation of the implied covenant of good faith and fair dealing. The motion to dismiss is granted as to the part of Count VI that seeks injunctive relief against termination of the dealership.

### B. Claims Seeking Damages

Counts IV, V, and VI seek damages for John Deere's failure to provide the plaintiffs with an opportunity to market the Model 605C loader. In its motion to dismiss, John Deere argues only the estate of Robert Heisel has standing to pursue these claims. (Docs. 15, 27.)

-15-

In response, the plaintiffs argue they are all third party beneficiaries of Robert Heisel's contract with John Deere, and as a result, have standing to sue for damages. (Doc. 21.)

As a general rule, an individual must be a party to a contract or a third party beneficiary before having standing to enforce the agreement. Aufenkamp v. Grabill, 112 S.W.3d 455, 458 (Mo. Ct. App. 2003). A third party beneficiary can sue to enforce the terms of a contract only if the contract terms clearly express an intent to benefit that party or an identifiable class of which that party is a member. Verni v. Cleveland Chiropractic Coll., 212 S.W.3d 150, 153 (Mo. 2007). Without an express statement of the intent to benefit a third party, there is a strong presumption that the third party is not a beneficiary and the parties contracted to benefit only themselves. Id. A mere incidental benefit to the third party is insufficient to bind that party. Id.

In Count IV, the plaintiffs allege John Deere violated the Farm Equipment Act when it denied the Heisel Equipment Company the opportunity to market the Model 605C loader. In alleging a violation of the statute, the plaintiffs rely on, and reference, language from the Dealership Agreement. (Doc. 1 at ¶¶ 60, 62) (quoting from Doc. 1, Ex. 1 at 2, 11.) Indeed, the Farm Equipment Act presupposes a contract between a dealer and the dealership. See Mo. Rev. Stat. § 407.838 (referring to the "dealership agreement"). In Counts V and VI, the plaintiffs look only to the Dealership Agreement, asserting claims for breach of contract and a violation of the covenant of good faith and fair dealing, in support of their respective damage claims. (Doc. 1 at ¶¶ 65-72.) Accordingly, all of the claims for damages rely on the Dealership Agreement.

The Dealership Agreement was signed by Robert Heisel, as owner of the Heisel Equipment Company, a proprietorship. No other individual signed on behalf of the Heisel Equipment Company. (Doc. 1, Ex. 1 at 3, 12.) In fact, the complaint states the Heisel Equipment Company "is a Missouri proprietorship, originally owned solely by Robert Heisel, a Missouri resident." (Doc. 1 at ¶ 7.) By definition, a sole proprietorship has a single owner and is characterized by a complete merger of the business entity with the individual doing business. Morgan

Wightman Supply Co. v. Smith, 764 S.W.2d 485, 492 (Mo. Ct. App. 1989). Unlike a corporation, a sole proprietorship has no legal existence separate from its owner, "and the contracts of a sole proprietorship are the contracts of the owner." Id.

The Dealership Agreement speaks about the relationship between the "Dealer whose signature appears on the [signature] page" and John Deere. In the section entitled "OBLIGATION OF THE PARTIES," the Dealership Agreement references only "the Dealer" and John Deere. (Doc. 1, Ex. 1 at 4, 13.) Within the Dealership Agreement, only section 5, which concerns the Dealer's death and the winding down of the dealership, references parties outside of the contractual relationship. (See id. at 6, 15.)

The alleged failure to deliver a Model 605C loader first became an issue in the Fall of 2005. (Doc. 1 at ¶¶ 25, 30, 31.) The issue therefore arose before Robert Heisel's death and during the life of the Heisel Equipment Company. (See id. at ¶ 37.) The question of whether John Deere had a duty to deliver the Model 605C loader is an issue relating to the "Obligations of the Parties." Indeed, Section 1 provides that the "Company agrees to accept orders placed by the Dealer for Goods which the Company contemplates will be shipped during the period of appointment, subject to the Company's Conditions of Sale." (Doc. 1, Ex. 1 at 4, 13.) As noted, this section does not mention heirs or survivors of the Dealer. Looking to Verni and Aufenkamp, the undersigned concludes only the party to the Dealership Agreement has standing to pursue the damage claims relating to the Model 605C loader.

When the party to a contract dies, and the contract is not of a personal nature, the decedent's interest or obligation passes to the personal representative. Aufenkamp, 112 S.W.3d at 460. The decedent's estate can only act by and through the personal representative. Id. (Decedent's two surviving sons lacked standing to enforce a sales contract between their late father and another company). Accordingly, only Mary Frances Heisel, acting in her capacity as the personal representative of the estate of Robert Heisel, doing business as Heisel Equipment Company, has standing to sue on the claims for damages. See id. The other plaintiffs do not have standing to assert these claims.

-17-

The motion to dismiss all plaintiffs other than Mary Frances Heisel, acting in her capacity as the personal representative of the estate of Robert Heisel, doing business as Heisel Equipment Company, is granted as to the remaining claims for damages.

### III. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of defendant John Deere Construction & Forestry Company to dismiss the dealership termination claims (Doc. 14) is granted. Counts I, II, III, and the part of Count VI that seeks injunctive relief are hereby dismissed with prejudice.

**IT IS FURTHER ORDERED** that the motion to dismiss all plaintiffs other than Mary Frances Heisel, acting in her capacity as the personal representative of the estate of Robert Heisel, doing business as Heisel Equipment Company (Doc. 14) is granted as to the remaining claims for damages. Only the claims for damages, as stated in Counts IV, V, and part of Count VI remain, and only Mary Frances Heisel, acting in her capacity as the personal representative of the estate of Robert Heisel, doing business as Heisel Equipment Company, has standing to pursue these claims.

/S/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 2, 2008.